IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CURTIS C. PHILLIPS, JR. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO.    14-6007 |
| NORTHAMPTON COUNTY, P.A., | : | |
| ATTORNEY GENERAL KATHLEEN | : | |
| KANE and PRISON WARDEN TODD L. | : | |
| BUSKIRK, | : | |

O'NEILL, J.                                                    September 14, 2016

**<u>MEMORANDUM</u>**

The present case involves a civil rights action brought by plaintiff Curtis C. Phillips, Jr.,

proceeding pro se, pursuant to 42 U.S.C. § 1983 against former Pennsylvania Attorney General

Kathleen Kane, Northampton County, Pennsylvania and Prison Warden Todd L. Buskirk.

Currently pending before the Court are (1) Kane's motion to dismiss and (2) Northampton

County and Buskirk's motion to dismiss.  For the following reasons, both motions will be

granted and the second amended complaint will be dismissed with prejudice.

**BACKGROUND**

Plaintiff's suit rests on a lengthy discourse regarding a series of events occurring over a

period of several years.  For purposes of clarity and comprehensiveness, I will provide an

abbreviated summary of the second amended complaint's allegations.

On March 23, 2012, plaintiff and two passengers were driving to a local park in the City

of Easton, Pennsylvania to play basketball.  Sec. Am. Compl. ¶ 9.  One of the rear-seated

passengers exited the car to speak with his brother, who was walking on the street.  <u>Id.</u> ¶¶ 10–12.

Plaintiff and his other passenger then parked the car and sat on a nearby bench to wait.  <u>Id.</u> ¶¶

13–15.  The trio re-entered the car and proceeded to the basketball court.  <u>Id.</u> ¶ 15.  Just before

reaching their destination, a marked patrol unit signaled to plaintiff to pull over.  Id. ¶ 16.  A second, unmarked vehicle then pulled behind plaintiff's vehicle.  Id. ¶ 18.  Two non-uniformed detectives, Detectives Ocetnik and Arrendondo, approached and demanded that plaintiff "get out of the car."  Id. ¶ 19.  Plaintiff asked why he was being stopped and, receiving no response, stated he would only get out when told what he had done wrong.  Id. ¶¶ 20–21.

Immediately thereafter, Detective Ocetnik approached the passenger side of plaintiff's vehicle and pointed to the floor of the vehicle stating, "there's a bag of dope on the floor.  Get out of the car."  Id.  ¶ 25.  He then removed the front-seated passenger from the car and handcuffed him, while Detective Arredondo ordered that neither the rear-seated passenger nor plaintiff move.  Id. ¶¶ 27-28.  The detectives patted the passenger down, at which time they found a hypodermic needle and a small quantity of heroin.  Id. ¶ 30.  Thereafter, the detectives removed plaintiff from the car, patted him down and placed him in handcuffs.  Id. ¶ 31.  A search of the vehicle ensued.  Id. ¶ 32.

During this time, plaintiff criticized the officers' actions and firmly demanded an explanation.  Id. ¶ 33.  They accused him of "just [doing] a drug deal" and being high, and threatened to charge him with driving under the influence.  Id. ¶ 34.  In addition, they seized his vehicle "pending investigation" and transported the three men to the Easton Police Department, where they were strip searched.  Id. ¶ 35.  At approximately 4:00 p.m. plaintiff was released from custody, but the officers refused to release his vehicle.  Id. ¶ 36.  After plaintiff's grandfather called the police department and threatened legal action, the police finally released the vehicle. Id. ¶¶ 38–39.  When Plaintiff and his grandfather arrived to pick up the vehicle, Detective Arredondo stated that plaintiff had to sign "release papers" related to criminal allegations that police had found a firearm inside the vehicle.  Id. ¶ 41.

According to plaintiff, the only drugs recovered came from the rear-seated passenger's pocket. Id. ¶¶ 43–46. Detectives Arredondo and Ocetnik, however, eventually filed a criminal complaint against plaintiff claiming they witnessed packets of drugs inside the vehicle and in plaintiff's clothing, as well as a firearm inside his vehicle. Id. ¶ 47. As a result, plaintiff was arrested and incarcerated due to his inability to post bail. Id. ¶ 48. Plaintiff claims the arrest warrant was forged with a false court seal. Id. ¶ 58.

Because the detectives failed to have the arrest warrant served by the state police, plaintiff was harassed in June 2012 by a plain-clothed City of Easton detective in an unmarked vehicle. Id. ¶ 62. In an effort to escape from "what appeared to be a crazed gun man looking for confrontation," plaintiff, who was driving, increased to a high level of speed until a slew of police vehicles forced him to stop. Id. Officer Charles McMonagle ordered him out of the vehicle at gun point, handcuffed him and took him into custody in relation to the fabricated arrest warrant. Id. ¶ 63. The arresting officer forcefully banged plaintiff's head down onto his vehicle, kicked his feet out from underneath him and dragged him through the parking lot. Id. Officer McMonagle then banged plaintiff's head on the door frame of the patrol vehicle used to transport him to the Easton Police Station. Id. ¶ 64. The officer committed plaintiff to the Northampton County Prison without providing him with a copy of an arrest warrant, a criminal complaint or any other notifications of pending criminal charges. Id. ¶ 65. Officer McMonagle also charged him with allegedly false driving infractions. Id. ¶ 66.

During plaintiff's preliminary hearing in relation to the charges resulting from these events, the judge set a cash bail of $425,000. Id. ¶ 75. As plaintiff could not afford the bail amount, he endured a lengthy pretrial incarceration. Id. ¶ 77. Immediately subsequent to the hearing on June 20, 2012, plaintiff was forced to submit to x-rays of his body, including his

mouth, chest and abdomen, wherein a nurse held him forcibly in front of the x-ray machine without the proper radiation-blocking smock or mouth guard.  Id. ¶ 78.

      Between June 2012 and March 2014—during his initial incarceration and reincarceration—plaintiff filed numerous "sick call request slip" forms with the prison's medical unit.  Id. ¶ 80.  These requests indicated plaintiff was suffering from large, painful, purple welts and sores on his face and body which he believed to be a symptom of radiation poisoning.  Id. ¶ 82.  Unidentified prison medical personnel provided no antibiotic ointments or creams.  Id. ¶ 83.  Between June 2, 2012 and June 12, 2012, and after March 6, 2013, plaintiff suffered drastic weight losses until he began to purchase food items from the commissary system.  Id. ¶¶ 87–88.  He claims that these periods of weight loss resulted from the Northampton County Prison's failure to provide a meal plan to inmates with adequate caloric content and nutritional value.  Id. ¶ 89.

      On July 31, 2012, plaintiff was attacked and assaulted in prison, resulting in a fractured fifth metacarpal bone in his left hand and a three centimeter laceration on his left forehead with apparent concussion and loss of consciousness.  Id. ¶ 90.  Medical personnel failed to timely and properly treat these injuries.  Id.  Prison staff eventually transported him to the Easton Area Hospital, where he was treated and returned to Northampton County Prison.  Id. ¶ 91.  Prison medical staff, however, refused to follow the hospital's instructions, substituted other non-effective medication for that originally prescribed and failed to schedule outside treatment with an orthopedic surgeon and/or therapist.  Id. ¶ 92.

      During Plaintiff's booking at Northampton County Prison, a corrections officer stripped plaintiff completely naked and forced him to sit in nothing more than a prison suit with no underwear, t-shirt, socks or shoes.  Id. ¶ 99.  After several hours, plaintiff finally demanded that a

lieutenant address the situation.  Id. ¶ 100.  The corrections officer responded by saying, "Keep talking like that and I'm gonna put you in the bubble," which is a level one suicide watch cell. Id. ¶¶ 101-102.  After plaintiff continued to demand a lieutenant, the corrections officer had him stripped naked and paraded through the prison, where he was committed to a level one suicide watch cell.  Id. ¶ 103.  Plaintiff claims he asked to see medical due to severe pain in his wrists and shoulders.  Id. ¶ 105.  The corrections officer responded, "What?  You gonna slit your wrists?" in an effort to justify placing plaintiff in a suicide watch cell.  Id. ¶ 107.  The cell had no mattress, sheets, blankets, pillows, clothing, pen or toothbrush.  Id. ¶ 109.  In addition, plaintiff received showers every third day, had no phone usage or access to the commissary and was forced to stay in a cell smeared with feces and other bodily fluids.  Id.

On January 7, 2013,[1] while in his cell, several officers ordered plaintiff to turn around and be handcuffed so that they could retrieve a plastic spork on which he had been chewing.  Id. ¶ 113.  After plaintiff was handcuffed, an Officer Wessner violently pushed him to the ground and, with the help of other officers, banged plaintiff's head approximately five times on the concrete floor.  Id. ¶¶ 114–115.

Upon his release from the suicide watch cell, plaintiff was moved into a regular cell and housed with several violent offenders, despite the fact that he did not have a violent criminal past.  Id. ¶ 122.  A fellow inmate advised him to file a grievance in relation to the incident with Officer Wessner.  Id. ¶ 123.  At this time, the only way to file a grievance form was to hand deliver it to an officer, who reviewed the complaint and signed off on it.  Id. ¶ 125.  The officers of Northampton County Prison, however, employed a "buddy system" under which they would not sign off on grievances against an officer, resulting in a large portion of the grievances going

---

[1]     The complaint states that this event occurred on January 7, 2012.  I assume this is a typographical error as that date was prior to plaintiff's incarceration in this matter.

unfiled.  Id. ¶ 126.  Nonetheless, plaintiff's grievance against Officer Wessner was processed and filed, and forwarded to the internal investigator for the prison.  Id. ¶¶ 127–128.  Plaintiff received no response.  Id. ¶ 129.

On July 31, 2015, plaintiff was attacked and assaulted within his cell by an inmate who had an extensive history of violent assaults.  Id. ¶ 130.  Plaintiff fell head first into a concrete overhang in the cell's doorway causing a large laceration to his left forehead and a broken fifth metacarpal bone in his left hand.  Id.  The laceration required seven sutures and the break required a partial cast, but plaintiff was not transferred to an outside medical facility until approximately three to four hours after the incident.  Id. ¶¶ 131–32.  Shortly after the assault, another inmate informed plaintiff that the assault was carried out as retaliation for the grievance he filed against Officer Wessner in exchange for drugs, street food and a prison job.  Id. ¶ 133.

Between June 2, 2012 and November 14, 2012, while housed on Tiers "H," "G" and "K," plaintiff was denied access to any means to conduct proper legal research sufficient to defend against his pending criminal charges.  Id. ¶ 136.  Between October 10, 2012 and November 14, 2012, Corrections Officer Santiago informed him that he could not access the law library while housed on "K" tier because he was not a sentenced inmate.  Id. ¶ 138.  This custom, policy and practice of the prison, in connection with his attorney's ineffective action, caused him to enter a plea of nolo contendere.  Id. ¶ 139.

In that same time period, the Northampton County Court of Common Pleas purportedly conspired with plaintiff's retained attorney and altered transcripts of hearings, causing his attorney to ignore evidence in his favor.  Id. ¶ 141.  The court allegedly did so in order to deflect a lawsuit alleging the unlawful acts of the arresting and charging officers.  Id. ¶ 142.

Between July 2012 and September 2012, plaintiff repeatedly explained to his attorney that the video recording from the police station would show that Detective Arredondo had falsified his statements in relation to witnessing a packet of heroin fall from an article of plaintiff's clothing while he was being strip searched.  Id. ¶ 145.  The prosecution claimed there was no video evidence and plaintiff's attorney refused to get a copy, even when it later became clear that the video existed and prosecutor withheld it.  Id.  This was a prominent factor influencing plaintiff's decision to enter into a plea deal.  Id. ¶ 146.

Plaintiff was paroled from Northampton County Prison on November 14, 2012, with stipulations to pay court costs and fines, submit to a psychological evaluation, submit to a drug and alcohol evaluation and submit to a random urine screening.  Id. ¶ 155.  On January 11, 2013, plaintiff's parole officer entered a petition for revocation of parole claiming plaintiff had violated every condition of his parole.  Id. ¶ 156.  Plaintiff asserts this petition was intentionally fraudulent since plaintiff had been compliant with all conditions.  Id. ¶ 157.

Plaintiff was re-arrested on March 6, 2013 and charged with crimes he did not commit.  Id. ¶ 161.  On that date, Pennsylvania State Trooper Michael Kalinchock conducted an unlawful and unwarranted search of his car.  Id. ¶ 162.  When plaintiff objected to the search as unlawful, the officer threatened the sole passenger of his vehicle with criminal charges unless he agreed to write a statement stating the drugs were not his, he had never seen them before and he knew they belonged to plaintiff.  Id. ¶ 163.  Arresting Pennsylvania State Trooper Jonathan Eckhart also coerced the written statement from the passenger by joining in the threats.  Id. ¶ 164.  Eckhart held a loaded, cocked and live twelve-gauge shotgun at plaintiff's head stating "move and I'll blow your f***ing head off."  Id. ¶ 166.

In the months following this incident, Troopers Kalinchock and Eckhart purportedly altered the video from Trooper Kalinchock's in-car recording device, failed to provide a second video/audio recording of the incident in question during trial, coerced statements and testimony by threatening plaintiff, failed to produce the NCIC/Clean System bulletin as displayed with the in-car system and made numerous false, misleading and blatantly contradictory statements throughout the pretrial and trial proceedings. Id. ¶ 169.  Plaintiff was ultimately convicted of possession with the intent to deliver heroin. Id. ¶ 170.

Between March 6, 2013 and March 26, 2014, the Northampton County Prison denied plaintiff access to an adequate law library in order to defend against his prosecution due to alleged issues of the prison being "short staffed." Id. ¶ 178.  In addition, plaintiff's pretrial and trial attorney conspired with the court and police to disregard fatal flaws in police procedures and/or other obvious misconduct in order to secure a conviction and deflect a civil action. Id. ¶ 182.  As a result, on December 5, 2013, plaintiff was convicted of possession with intent to deliver heroin and sentenced to two to eight years of incarceration with a consecutive three-year term of probation. Id. ¶ 194.

Immediately thereafter, plaintiff fashioned a pro se post-sentence motion and also filed a writ of summons initiating a civil suit. Id. ¶¶ 185–86.  Upon the filing of his suit, plaintiff was told that he had given dirty urine and was transported to the "BHU" housing unit within the prison. Id. ¶ 191.  On placement in the cell, he was told to strip naked, but he refused because one of the guards appeared to have his hand in his pants rubbing his penis. Id. ¶ 193.  A lieutenant arrived and told the guards to "go ahead." Id. ¶ 197.  The guards then tackled plaintiff football-style, pushed their entire weight onto him, began violently tearing off his clothing off of him and moved a foreign object in and out of his anus in a sexual manner. Id. ¶ 198.  The men

then left plaintiff completely naked for a number of hours.  Id. ¶ 200.  On March 4, 2014, plaintiff filed a grievance in relation to the assault.  Id. ¶ 205.  Shortly thereafter, plaintiff met with a prison investigator who discussed only the request to file a civil complaint against Officers Arredondo and Ocetnik without inquiring about the events regarding the recent assault. Id. ¶¶ 205-07.  In the days following the assault, plaintiff developed severe bruising all over and was not fully healed for around thirty-five days.  Id. ¶ 209-10.

After months of letters and phone calls, plaintiff's appellate attorney finally returned his transcripts on August 16, 2014.  Id. ¶ 222.  The attorney did not file an amended post-sentence motion in the mater as promised.  Id. ¶ 223.  The attorney also attempted to plead guilty to plaintiff's parole violation on his behalf, despite the existence of exculpatory evidence.  Id. ¶ 225.  When plaintiff finally reviewed the transcripts, he found that a large portion of the issues which he raised were re-worded and some portions changed completely.  Id. ¶ 226.

On October 18, 2014, plaintiff filed this pro se action against Northampton County based on his arrests, prosecutions, convictions and conditions of confinement.  I entered an order dated October 31, 2014 dismissing without prejudice plaintiff's complaint pursuant to 28 U.S.C. § 1915.  Plaintiff then filed his first amended complaint raising constitutional claims against defendant Northampton County, Prison Warden Todd L. Buskirk and former Pennsylvania Attorney General Kathleen Kane based on events ranging from his arrests to his incarceration.  I again dismissed the case under 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim. Specifically, I found several of plaintiff's claims time-barred, including his claims related to: (1) an allegedly illegal search and seizure conducted by officers of the Easton Police Department on March 23, 2012, during which plaintiff claims he was strip searched; (2) the seizure of plaintiff's car from March 23, 2012 through March 28, 2012 and (3) allegations that an officer threatened

plaintiff with a gun on June 2, 2012, falsely arrested him and subjected him to excessive force. Additionally, I dismissed plaintiff's claims against Buskirk and Kane on the ground that plaintiff's allegations against them were too general and conclusory to state a plausible claim for relief. Finally, as to the claims against Northampton County, I found that plaintiff had not properly alleged a custom or policy that gave rise to the alleged constitutional violation. Nonetheless, I gave plaintiff leave to file a second amended complaint, instructing him that "he should identify all of the defendants in the caption of the second amended complaint in addition to the body of the second amended complaint and describe how each defendant was responsible for violating his rights." Order, ECF No. 10 (July 10, 2015).

On November 9, 2015, plaintiff filed his second amended complaint. Notwithstanding the prior order, plaintiff again alleged federal constitutional and state law claims against only defendants Northampton County, former Pennsylvania Attorney General Kathleen Kane and Prison Warden Todd L. Buskirk without naming as defendants the other individuals actually involved in the alleged violations. On January 4, 2016, Kane filed a motion to dismiss the second amended complaint against her, and plaintiff responded on January 27, 2016. On January 28, 2016, defendants Northampton County and Buskirk filed a motion to dismiss the second amended complaint against them, and plaintiff responded on April 6, 2016.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." Bell Atl. Corp. v. Twombly,

550 U.S. 544, 555 (2007) (quotations omitted).  "[T]hreadbare recitals of the elements of a cause

of action, supported by mere conclusory statements, do not suffice" and  "only a complaint that

states a plausible claim for relief survives a motion to dismiss."  Ashcroft v. Iqbal, 556 U.S. 662,

678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  Id.  A complaint does not show an entitlement to relief when the well-pleaded facts do

not permit the court to infer more than the mere possibility of misconduct.  Id.

The Court of Appeals has established a two-part analysis for review of a Rule 12(b)(6)

motion.  First, the well-pled factual allegations of the claim must be separated and accepted as

true, while the legal conclusions are disregarded.  Fowler v. UPMC Shadyside, 578 F.3d 203,

210–11 (3d Cir. 2009).  Second, the court must make a common sense determination as to

whether the facts alleged in the complaint are sufficient to state a plausible claim for relief.  Id. at

211.  If the court can only infer the possibility of misconduct, the complaint must be dismissed

for failure to "show" an entitlement to relief.  Id.

A prisoner's pro se complaint, however, should be "held to less stringent standards than

formal pleadings drafted by lawyers."  United States ex rel. Walker v. Fayette Cnty., Pa., 599

F.2d 573, 575 (3d Cir. 1979), citing Haines v. Kerner, 404 U.S. 519, 521 (1972).  The Court

must construe the facts stated in the complaint liberally in favor of the plaintiff.  Haines, 404

U.S. at 520.  "Yet there are limits to our procedural flexibility.  For example, pro se litigants still

must allege sufficient facts in their complaints to support a claim."  Mala v. Crown Bay Marina,

Inc., 704 F.3d 239, 245 (3d Cir. 2013).  Thus, even a pro se complaint must conform with the

requirements of Rule 8(a) of the Federal Rules of Civil Procedure, which "demands more than an

unadorned, the-defendant-unlawfully-harmed-me accusation" or "naked assertions" that are

devoid of "factual enhancement." <u>Ashcroft</u>, 556 U.S. at 678 (2009) (internal quotations omitted). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do." <u>Id.</u>

## DISCUSSION

## I.      Motion to Dismiss of Former Attorney General Kathleen Kane

Defendant Kathleen Kane first seeks to dismiss all claims against her because (1) the Eleventh Amendment bars § 1983 claims against her in her official capacity and (2) the § 1983 claims against her in her individual capacity fail to state a claim upon which relief may be granted.  Upon consideration, I will grant her motion.

### A.      Claims Against Kane in Her Official Capacity

Kane first argues that to the extent plaintiff sues her in her official capacity, his claims must be dismissed under Federal Rule of Civil Procedure 12(b)(1).[2]  She notes that a plaintiff

_____

[2]      A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the power of a federal court to hear a claim or a case.  <u>Gould Elecs., Inc. v. United States</u>, 220 F.3d 169, 178 (3d Cir. 2000). When presented with a Rule 12(b)(1) motion, the plaintiff "will have the burden of proof that jurisdiction does in fact exist."  <u>Petruska v. Gannon Univ.</u>, 462 F.3d 294, 302 n.3 (3d Cir. 2006).  There are two types of Rule 12(b)(1) motions.  A "facial" attack assumes that the allegations of the complaint are true, but contends that the pleadings fail to present an action within the court's jurisdiction.  <u>Mortenson v. First Fed. Sav. & Loan Ass'n</u>, 549 F.2d 884, 891 (3d Cir. 1977).  A "factual" attack, on the other hand, argues that, while the pleadings themselves facially establish jurisdiction, one or more of the factual allegations is untrue thereby causing the case to fall outside the court's jurisdiction.  <u>Mortenson</u>, 549 F.2d at 891.  In such a case, "no presumptive truthfulness attaches to plaintiff's allegations" and the court must evaluate the merits of the disputed allegations because "the trial court's . . . very power to hear the case" is at issue.  <u>Id.</u>  A motion to dismiss pursuant to the Eleventh Amendment—as in the present case— is properly reviewed under Federal Rule of Civil Procedure 12(b)(1).  <u>Blanciak v. Allegheny Ludlum Corp.</u>, 77 F.3d 690, 693 n.2 (3d Cir. 1996).  Such a motion is a "facial" challenge.  <u>See, e.g.</u>, <u>Scott v. Commonw. Dep't of Public Welfare</u>, No. 02-3799, 2003 WL 22133799, at *2 (E.D. Pa. Aug. 28, 2003); <u>Nelson v. Commonw. of Pa. Dep't of Public Welfare</u>, 244 F. Supp. 2d 382, 386 (E.D. Pa. 2002).

may only bring a section 1983 action if he alleges that a "person" acting under color of state law deprived him of rights, privileges or immunities secured by the Constitution or laws of the United States.  42 U.S.C. § 1983.  As she is not a "person" in her official capacity, she claims that she may not be held liable under this provision.

I agree with Kane's argument.  The United States Supreme Court has recognized the difference between official-capacity and personal-capacity lawsuits as follows:

> [O]fficial-capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" . . . A suit against a state official in her official capacity therefore should be treated as a suit against the State . . . .  Indeed, when an official sued in this capacity in federal court dies or leaves office, her successor automatically assumes her role in the litigation . . . . Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, "the entity's 'policy or custom' must have played a part in the violation of federal law." . . . For the same reason, the only immunities available to the defendant in an official-capacity action are those that the governmental entity possesses.
>
> Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law.  Thus, "[o]n the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." . . . While the plaintiff in a personal-capacity suit need not establish a connection to governmental "policy or custom," officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law.

Hafer v. Melo, 502 U.S. 21, 25 (1991) (emphasis in original) (citations omitted).  In other words, an official-capacity suit is merely another way of pleading an action against an entity of which an officer is an agent.  Kentucky v. Graham, 473 U.S. 159, 165 (1985).

To that end, the United States Supreme Court has expressly held that the phrase "person" in 42 U.S.C. § 1983 was not meant to include state officials in their official capacities.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 70–71 (1989).  Pursuant to the Eleventh Amendment, "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State."  Edelman v. Jordan, 415 U.S. 651, 662–663 (1974).  Thus, consistent with the notion that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," the Eleventh Amendment also precludes suits against state officials in their official capacities.  Will, 491 U.S. at 70–71.

In the present case, Kane was the Pennsylvania Attorney General.[3]  In that position, she was managerially responsible for the administrative operations of the Office of the Attorney General.  71 P.S. § 732-201.  The Office of the Attorney General is an executive agency of the Commonwealth.  71 P.S. § 61.  As an official of a state executive agency, the Eleventh Amendment bars federal subject matter jurisdiction over the § 1983 claim against her in an official capacity.[4]  Therefore, I will dismiss this claim under Federal Rule of Civil Procedure 12(b)(1).

---

[3]     On August 17, 2016, during my consideration of the pending motions, Kathleen Kane tendered her resignation as Pennsylvania Attorney General.  No substitution of the new Attorney General has been made.

[4]     Plaintiff argues that the Office of the Attorney General is not an "agency" within the context of Will v. Michigan State Police, 491 U.S. 58 (1989).  He goes on to argue that Defendant Kane bears the burden of showing that the Office of the Attorney General is an "executive agency" and, because she has not done so, the Court must find any Eleventh Amendment immunity waived.  As set forth above, however, the Pennsylvania statutes cited by Kane explicitly designate the Office of the Attorney General as an executive agency of the Commonwealth.

**B.**     **Claims Against Kane in Her Individual Capacity**

In order for an individual to be liable under section 1983 in his or her capacity as a supervisor, the individual must have had "personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005), quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Two general theories exist under which a supervisor may be held liable for the constitutional acts of a subordinate. A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004). The first relates to a supervisor's role as a policymaker and supports liability where the supervisor, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." See Luzerne, 372 F.3d at 586 (alteration in original), quoting Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989).

The second theory relates to situations where a supervisor had a certain personal connection to a constitutional violation by "participat[ing] in violating the plaintiff's rights, direct[ing] others to violate them, or, as the person in charge, ha[ving] knowledge of and acquiesc[ing] in his subordinate's violations." Marlin v. City of Reading, 118 F. Supp. 3d 751, 773 (E.D. Pa. 2015). Claims that a supervisor failed to train or supervise are also viable in the context of supervisory liability, and "are generally considered a subcategory of policy or practice liability." Id. The plaintiff must not only identify a "specific supervisory practice that the defendant failed to employ," he or she must also allege "'(1) both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have a communicated a

message of approval.'" <u>C.H. ex rel. Z.H. v. Oliva</u>, 226 F.3d 198, 202 (3d Cir. 2000), <u>quoting</u>

<u>Bonenberger v. Plymouth Twp.</u>, 132 F.3d 20, 25 (3d Cir. 1997).

The second amended complaint's allegations regarding Kane's actions are sparse at best.

Plaintiff asserts:

> The actions of the City of Easton Police Department along with County of Northampton, Pennsylvania officials in unlawfully stopping, detaining and/or arresting persons where no legal cause exists and/or existed, unlawfully investigating and/or conducting surveillance on persons where no legal cause exists and/or existed, unlawfully pursuing legal action in effects to defect civil lawsuits arising from officer and/or official misconduct where no legal cause exists and/or existed, using excessive and/or unreasonable force against persons where no legal cause exists and/or existed, engaging in unlawful investigatory and/or surveillance procedures, intimidating, threatening and/or harassing persons where no legal cause exists and/or existed, tactically over-charging individuals where no legal cause exists and/or existed, retaliating against persons as described within relevant factual averments throughout the complaint, working in conjunction and/or conspiracy with area lawyers and/or attorn[eys] in order to achieve an omission of official misconduct and/or in order to secure convictions of persons which legally should not be convicted, fabricating and/or forging warrants for arrest of persons, making knowingly false accusations against persons in attempts to secure warrants for arrest, as well as within criminal complaints against persons, failing to disclose all known exculpatory evidence unto the prosecution and/or attorney for the defense as is required under <u>Brady v. Maryland</u> and its progeny, coercing witnesses into identifying suspects, tampering with and/or fabricating evidence and altering and/or destroying evidence, subjecting persons to prejudicial and/or unlawfully based trials, engaging in prosecutorial misconduct, tampering with and/or altering transcriptions of court proceedings and endangering the lives of inmates through those actions described in relation to this complaint *have been brought to the attention of Kathleen G. Kane, who was at all times relevant to this complaint the Attorney General of the Commonwealth of Pennsylvania, as requiring more or different training, supervision, investigation and/or discipline within the identified areas and/or in relation to the identified policies, practices and customs relevant to, and identified within the complaint.*

Sec. Am. Compl. ¶ 242 (emphasis added).  Focusing more specifically on Kane, the second

amended complaint then alleges:

> 255.    As stated within the factual averments to this complaint, the
> repeated misconduct as described in relation to this complaint has
> been brought to the attention of the Attorney General's office on a
> regular basis, at a rate so immense that the person and/or collection
> of persons delegated to identifying, investigating, responding to
> and/or disciplining the person and/or collection of persons who
> tolerated, encouraged, ratified, turned a blind eye to and/or has
> been deliberately indifferent to these policies, practices, customs
> and/or patterns of conduct, throughout the various jurisdictions of
> the Commonwealth, must have been fully aware of them and
> willfully and intentionally failed to properly and adequately
> establish policies for more or different training, suspension,
> internal investigation and discipline, and/or to take reasonable
> steps to identify investigate, respond to and/or discipline the
> persons and/or collections of persons implementing such conduct
> in the course of their official duties, in a manner sufficient to serve
> as deterrence.
>
> 256.    As the Attorney General, at all times relevant to this
> complaint, a portion of the duties and responsibilities of Kathleen
> G. Kane was to adequately conduct preventative action regarding
> the misconduct alleged throughout the complaint as well to
> identify and/or eradicate such conduct.
>
> 257.    Attorney General Kathleen G. Kane failed to conduct the
> portion of her duties and responsibilities as described throughout
> this complaint in conjunction with points 255-256 of this
> document.
>
> 258.    The failure of Kathleen Kane to adequately and properly
> perform her duties and responsibilities was a direct and proximate
> cause and a substantial factor in the bringing about of my damages
> as described above and therefore Kathleen Kane is liable to me
> under 42 U.S.C. § 1983 for the damages which I incurred as a
> result.

Sec. Am. Compl. ¶¶ 255–58.

These allegations fail to properly state a § 1983 cause of action against Kane.  Nothing in

the second amended complaint avers that Kane had any personal connection to the alleged

constitutional violations by participating in the violation of plaintiff's rights, directing others to violate them or having knowledge in and acquiescing in her subordinates' violations. A mere hypothesis that Kane may have somehow been involved because of her position as head of the Office of the Attorney General is not a reasonable inference to be drawn from the facts of the second amended complaint. See Evancho, 423 F.3d at 354. Moreover, the second amended complaint does not contain—nor could it—any allegations that Kane was responsible for any of the detectives, corrections officers, court staff or prison medical staff that allegedly committed the constitutional violations. Indeed, under Pennsylvania statutes, Kane, as Attorney General, was the "chief law enforcement officer of the Commonwealth," in contrast to the district attorney who is "the chief law enforcement officer for the county in which he is elected." 71 P.S. § 732-206(a). Thus, to the extent plaintiff alleges violations by Northampton County employees, Kane had no authority over them. In turn, she cannot be individually liable for a failure to train, supervise or discipline.

To the extent plaintiff alleges that Kane failed to exercise her authority as Attorney General to bring charges against individuals committing known constitutional violations within the Commonwealth, his second amended complaint fails in multiple respects. First, although plaintiff baldly alleges that "the repeated misconduct as described in relation to this complaint has been brought to the attention of the Attorney General's office," the second amended complaint lacks factual averments to support this statement. At no point does plaintiff articulate how the Attorney General's office would have had "contemporaneous knowledge" about this conduct or a prior pattern of similar conduct. Second, plaintiff has put forth no factual allegations regarding the circumstances "under which [Kane's] inaction could be found to have communicated a message of approval" to the state officials. Finally, even assuming arguendo

that Kane had some knowledge of the various events described, nothing within the second amended complaint, aside from plaintiff's perfunctory allegations, allows an inference that Kane's decision to not bring criminal charges against the state actors reflects deliberate indifference to plaintiff's rights.

In short, the second amended complaint is devoid of allegations on which Kane may be held liable under section 1983.  Therefore, I will dismiss all claims against her.

## II.     Motion to Dismiss of Defendants Todd L. Buskirk and Northampton County

### A.     Warden Todd L. Buskirk

Warden Todd L. Buskirk also seeks dismissal of all claims brought against him in either his official or individual capacities.  As to Buskirk's liability in his official capacity, this claim—like that against Defendant Kane—must be dismissed.  Buskirk is the warden for Northampton County Prison.  A county prison does not have the legal capacity to be sued in its own name. Phillips v. Miller, No. 09-0555, 2010 WL 771793, at *2 (M.D. Pa. Feb. 26, 2010).  If the prison has no capacity to be sued, its warden likewise has no capacity to be sued in his official capacity and, hence, should be dismissed.  BirckBichler v. Butler Cnty. Prison, No. 07-1655, 2009 WL 2986611, at *5 (W.D. Pa. Sept. 17, 2009); see also Horne v. District Attorney York Cnty., 499 F. App'x 140, 142 (3d Cir. 2012) (holding that claims against the York County Prison and Prison Warden in his official capacity are prohibited by the Eleventh Amendment).

As to the claims against Warden Buskirk in his individual capacity, they fail for substantially the same reasons the claims against Kane fail.  The second amended complaint alleges:

> 241.    The actions of the Northampton County prison staff in retaliating against inmates by those means express in relevant relation throughout the factual averments with-in this complaint, unlawfully using excessive and unreasonable force against

inmates, providing a nutritionally inadequate meal plan to inmates, denying certain categories of inmate any and reasonable medical attention in order to benefit the financial interests of the medical care provider and the County, refusing to honor the special diet needs of those inmates who require a special diet and sexually abusing and/or engaging in unlawful sexual activities with inmates have been brought to the attention of Warden Todd L. Buskirk, who was at all times relevant to this complaint the appointed prison warden of the Northampton County Prison, as requiring more or different training, supervision, investigation and/or discipline with-in the identified areas and/or in relation to the identified policies, practices and customs relevant to this complaint.

   . . . .

259.   Defendant Todd L. Buskirk was at all times relevant to this complaint the Warden of the Northampton County Prison in the City of Easton, Pennsylvania.

260.   As stated within the factual averments to this complaint, the repeated misconduct as described in relation to this complaint has been brought to the attention of Warden Todd L. Buskirk on a regular basis at a rate so immense that he, as well as the person and/or collection of persons delegated to identifying, investigating, responding to and/or disciplining the person and/or collection of persons who tolerated, encouraged, ratified, turned a blind eye to and/or has been deliberately indifferent to these policies, practices, customs and/or patterns of conduct—who were under the direct control and supervision of Mr. Buskirk, must have been fully aware of them and willfully and intentionally failed to properly and adequately establish policies for more or different training, supervision, internal investigation and discipline, and/or to take reasonable steps to identify investigate, respond to and/or discipline the persons and/or collections of persons implementing such conduct in the course of their official duties, in a manner sufficient to serve as deterrence.

261.   As the prison warden of the Northampton County Prison at all times relevant to this complaint, a portion of the duties and responsibility of Todd L. Buskirk included adequately conducting preventative actions regarding the misconduct alleged throughout this complaint as well as to identify and/or eradicate such conduct.

262.   The failure of Prison Warden Todd L. Buskirk to adequately and properly perform the portion of his duties and responsibilities as is described throughout this complaint in

> conjunction with points 260–261 of this document were a direct
> and proximate cause and a substantial factor in the bringing about
> of the damages which I have suffered as described above and
> therefore Mr. Buskirk is liable to me under 42 U.S.C. § 1983 for
> the damages which I incurred as a result.

Sec. Am. Compl. ¶¶ 241, 259–62.

These allegations against Buskirk are devoid of any facts suggesting liability.  The second amended complaint does not aver that Buskirk was personally involved in or responsible for any of the purported violations that occurred within Northampton County Prison, meaning that plaintiff must rely on a supervisory "deliberate indifference" theory.  To establish a supervisory liability claim based on "deliberate indifference," plaintiff must (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.  Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001).  Although a pro se prisoner need not identify, prior to discovery, the "specific supervisory practice or procedure" that the supervisor failed to employ, plaintiff must, even at the early stage of the proceedings, "do more than recite conclusory allegations."  Martinez v. Warner, No. 07-3213, 2008 WL 2331957, at *10–11 (E.D. Pa. June 5, 2008).  "[I]t is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did."  Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989).  Rather, the plaintiff must "identify specific acts or omissions of the supervisor that evince deliberate indifference and persuade the court that there

is a relationship between the 'identified deficiency' and the 'ultimate injury.'"  <u>Brown</u>, 269 F.3d at 216, <u>quoting</u> <u>Sample</u>, 885 F.2d at 1118.

Plaintiff has not identified any conduct or policies on the part of, or created by Buskirk. He has not shown that Buskirk knew or should have known that any unreasonable risk existed, but remained deliberately indifferent to that risk.  Nor has plaintiff connected any such conduct or absence thereof to any of his injuries.  Even taking all allegations in the second amended complaint in the light most favorable to plaintiff, I cannot infer that Buskirk failed to implement proper safeguards against the various alleged patterns of misconduct within the prison.  Having had the opportunity to twice amend his complaint to properly plead a claim against Busirk and having failed to set forth any factual allegations upon which I can base an inference of wrongdoing, plaintiff cannot now survive Rule 12(b)(6) scrutiny.  Accordingly, I will dismiss the claims against Buskirk.

### B.  Northampton County

Finally, plaintiff brings both federal and state law claims against defendant Northampton County.  Northampton County seeks to dismiss the entirety of the second amended complaint against it.

### 1.      Federal Constitutional Violations

In the seminal case of <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978), the United States Supreme Court confirmed that "Congress *did* intend municipalities and other local government units to be included among those persons to whom §1983 applies," but emphasized that, "a municipality cannot be held liable under § 1983 on a respondeat superior theory."  <u>Id.</u> at 690–91 (emphasis in original).  To establish section 1983 liability against such a governing body, the plaintiff must identify either a "policy statement, ordinance, regulation, or decision officially

adopted and promulgated by that body's officers," or "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels."  Id.  A policy is shown when "a 'decisionmaker possessing final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict."  Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996), quoting Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990).  A custom is defined as "'such practices of state officials so permanent and well-settled as to constitute law,'" which can be established by showing the policymaker's knowledge and acquiescence to the custom.  Id., quoting Andrews, 895 F.2d at 1480.  Alternatively, a custom or policy may be established from a failure to train, supervise or otherwise act where that failure reflects a deliberate indifference of officials to the rights of persons that come into contact with these municipal employees.  City of Canton v. Harris, 489 U.S. 378, 388 (1989); Reitz v. Cnty. of Bucks, 125 F.3d 139, 145 (3d Cir. 1997).  As succinctly summarized by the Court of Appeals, three situations exist where acts of a government employee are deemed to be the result of a policy or custom of the governmental employer:

> The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy. . . .  The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself. . . Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (internal quotation marks and citations omitted).

Beyond identification of a policy or customary failure to act, establishment of section 1983 municipal liability requires a showing of causation.  "[I]t is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality."  Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997).  Rather, plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  Id.; see also Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (plaintiff carries burden of demonstrating a "plausible nexus" or "affirmative link" between the municipality's custom or policy and the constitutional deprivation challenged).  The standard of causation is stringent and requires that "the identified deficiency . . . be closely related to the ultimate injury."  Canton, 489 U.S. at 391.

In this case, plaintiff alleges a litany of Monell claims against Northampton County based on the activities of various employees or officers of Northampton County performed pursuant to certain "unofficial polic[ies], practice[s], and customs," as follows:

> 228.    The Northampton County Courthouse employs an unofficial policy, practice and custom of intentionally altering transcriptions of hearings held in the criminal court in order to secure convictions and to maintain large profits for the County.
>
> 229.    The Northampton County Court of Common Pleas employs an unofficial policy, practice and custom of pursuing criminal charges against individuals where they clearly should not, in order to deflect lawsuits arising out of officer misconduct, and thereafter working in concert with the area attorneys in order to omit serious errors and misconduct from being addressed on the official record, thereby securing convictions and benefitting the interests of the County.
>
> 230.    The various jurisdictions within Northampton County, including the City of Easton Police Department, employ an unofficial policy, practice and custom of engaging in unlawful investigative and surveillance techniques, engaging in unlawful

arrest and detention techniques and unlawful prosecutorial techniques during the relevant period of their criminal investigations and prosecution due to the fact that they know that the court will assist them in securing their conviction in the prosecution stemming from the described unlawful acts.

231.    The City of Easton Police Department employs an unofficial policy, practice and custom of withholding exculpatory evidence from a criminal defendant during court proceedings, making false statements while under oath in efforts to get arrest warrants and to secure convictions, tampering with evidence and forging warrants or arrest by falsifying court seals with a [illegible] which should have been turned in during a previous year.

232.    The Northampton County Prison staff employ an unofficial policy, practice and custom of retaliating against inmates who file grievances and/or pursue legal action against fellow guards in response to mistreatment and officer misconduct, and/or the County of Northampton, respectively.

233.    The Northampton County Prison staff employ an unofficial policy, practice and custom of using force against inmates where no legal cause exists to justify a use of force, as well as using force which is clearly excessive and unreasonable in the circumstances.

234.    The Northampton County Prison staff employ an unofficial policy, practice and custom of placing inmates into suicide watch where no cause exists to justify such a placement and doing so as retaliatory action against inmates for various reasons.

235.    The Northampton County Prison's Medical Department employs an unofficial policy, practice and custom of denying inmates with no medical care insurance adequate and any, as well as providing deliberately indifferent treatment, in order to benefit the interests of [the] County and the medical provider.

240.[5]   The Northampton County Prison's Medical Department employs an unofficial policy, practice and custom of substituting medications and/or treatment orders prescribed by doctors more qualified than themselves in order to benefit the interests of the County and the medical provider.

Sec. Am. Compl. ¶¶ 228–40.

---

[5]    Plaintiff's numbering of his second amended complaint skips over paragraphs 236–239.

Assuming for purposes of this motion only that the underlying acts alleged in the second amended complaint set forth constitutional violations by the individual actors, [6] none of the foregoing allegations suffice to establish <u>Monell</u> liability against Northampton County for these acts.  I address them separately.

> **a. Practices by the Northampton County Courthouse and Court of Common Pleas in Pursuing False Charges to Deflect Suits Arising from Officer Misconduct and Altering Transcipts of Hearings to Secure Convictions (Sec. Am. Compl. ¶¶ 228, 229)**

Plaintiff's first set of allegations posits that the Northampton County court system maintained an unofficial policy, custom or practice by the Northampton County courts to bring improper criminal charges and alter transcripts of hearings in order to improperly secure convictions.  He argues that his attorney conspired with the court to cover up the improper conduct of the arresting officers.  Sec. Am. Compl. ¶¶142–43.  He then asserts that his preliminary hearing transcripts were forged, that the prosecution withheld exculpatory evidence in the form of a video and radio broadcasts and that his attorney conspired with courthouse officials to deprive plaintiff of a fair trial.  <u>Id.</u> ¶¶ 141–54.  Finally, he reasserts that his pretrial

---

[6]     Defendants engage in a lengthy analysis of why many of the underlying acts do not constitute actionable constitutional violations upon which a <u>Monell</u> claim may be based.  Specifically, they assert that plaintiff's claim regarding a conspiracy to convict him is barred by the favorable termination rule, the unlawful search claim resulting from his strip search fails under <u>Florence of Board of Chosen Freeholders of Burlington County</u>, 132 S. Ct. 1510, 1524 (2012), his 2012 conditions of confinement claim is time barred, his access to the law library claim during his first incarceration is time barred and his access to the law library claim during his second incarceration is meritless.

        Defendants are correct that <u>Monell</u> liability cannot stand in the absence of an underlying constitutional violation.  <u>Grazier ex rel. White v. Phila.</u>, 328 F.3d 120, 124 (3d Cir. 2003).  Nonetheless, these arguments require me to delve into the factual nuances of this present case and inspect the actions of the individual actors who are not named defendants.  This is a task I am not inclined to undertake when considering a motion to dismiss.  I find that the more appropriate and persuasive inquiry is whether, even if these various actions are constitutional violations by the individual actors, the second amended complaint allows the inference that Northampton County maintained a policy, practice or custom that resulted in the alleged constitutional violations.

and trial attorneys conspired with the court and police in order to "omit fatal flaws in police procedures and/or other obvious misconduct in order to secure a conviction and to deflect a civil action which would have arisen as a result of an over-turned, or non-conviction." Id. ¶ 182.

From these allegations pertaining only to plaintiff's personal circumstances—and notwithstanding the principle that "[v]ague assertions" of policy or custom are not sufficient to impose liability, Groman v. Twp. of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995)—plaintiff makes the broad leap to assert that these events stemmed from a broad policy or custom within the Northampton County courts.  In doing so, plaintiff does not suggest that this practice occurred so regularly that Northampton County should have known of such a practice and deliberately turned a blind eye to it.  Nor has plaintiff set forth facts to show that the alleged constitutional violations were taken pursuant to a standard, albeit unofficial, practice within Northampton County.  While plaintiff is not expected to plead such a claim with any great specificity, the inference of a general policy or custom of fabricating charges, tampering with evidence and securing false convictions is simply too tenuous based on the allegations of the second amended complaint.  Accordingly, I will dismiss this claim.

           **b.  Practices by the City of Easton Police Department in Engaging in Unlawful Investigative, Surveillance, arrest and Detention Techniques, and then Withholding Exculpatory Evidence and Making False Statements or Record (Sec. Am. Compl. ¶¶ 230, 231)**

Plaintiff's next claim asserts that the members of the City of Easton Police Department employ an unofficial policy and practice of engaging in unlawful investigative and surveillance techniques, arrest and detention techniques and prosecutorial techniques.  In addition, plaintiff contends the Easton Police Department has a policy and practice of withholding exculpatory evidence from a criminal defendant, making false statements under oath to get arrest warrants and tampering with evidence.  Despite the existence of these claimed practices, plaintiff alleges

that defendant Northampton County has failed to take remedial actions and discipline the officers, thereby making it liable under Monell.

As noted above, however, a municipality may be liable under § 1983 for a failure to train subordinate officers only where such failure reflects a policy of deliberate indifference to the constitutional rights of citizens.  See Canton, 489 U.S. at 390–91. The same standard applies to claims of inadequate supervision and is "difficult" to satisfy.  Groman, 47 F.3d at 637; Reitz v. Cnty. of Bucks, 125 F.3d 139, 145 (3d Cir. 1997).  To maintain such a claim, a plaintiff must show that "a responsible municipal policymaker had contemporaneous knowledge of the offending occurrence or knowledge of a pattern of prior incidents of similar violations of constitutional rights and failed to take adequate measures to ensure the particular right in question or otherwise communicated a message of approval to the offending subordinates." Garcia v. Cnty. of Bucks, Pa, 155 F. Supp. 2d 259, 268 (E.D. Pa. 2001).  "A need for training or other corrective action to avoid imminent deprivations of a constitutional right must be so apparent that any reasonable policymaker or supervisor would have taken appropriate preventive measures."  Id.  "It is not sufficient merely to show that a particular officer acted improperly or that better training would have enabled an officer to avoid the particular conduct causing injury." Id.  "[A] municipality's deliberately indifferent failure to train is *not* established by (1) presenting evidence of the shortcomings of an individual; (2) proving that an otherwise sound training program occasionally was negligently administered; or (3) showing, without more, that better training would have enabled an officer to avoid the injury-causing conduct."  Simmons v. Phila., 947 F.2d 1042, 1060 (3d Cir. 1991) (emphasis in the original).

Even judging plaintiff's second amended complaint under the most lenient standards, I cannot find that he has adequately pled a Monell claim.  Plaintiff describes in detail the events

surrounding his March 2012 automobile stop and the individual actions of Detectives Alledondo

and Ocetnik, (Sec. Am. Compl. ¶¶ 9–57), his arrest on a warrant by Officer McMonagle (id. ¶

62–77) and his re-arrest while on parole in March 2013.  Id. ¶¶ 161–75.  His extensive

descriptions of these events and the ensuing charges brought against him focus solely on the

actions of the individual officers on those particular occasions.  Plaintiff then makes the tenuous

leap to allege that:

> Arrests where no probable cause, or legal justification existed, or
> was in question or should have been in question, have been
> occurring throughout the various jurisdictions within the county of
> Northampton for at least fifteen years at a rate so immense that the
> persons and/or collection of persons within the County delegated
> to identifying, responding to, investigating and/or disciplining the
> person and/or collection of persons implementing the patterns of
> misconduct alleged knew, or otherwise should have known, that
> stricter training procedures, hiring procedures, investigative
> procedures, and/or disciplinary procedures were required
> throughout the various law enforcement divisions with-in and
> willfully declined to address, respond to, discipline and/or
> investigate the person and/or collection of persons engaging in
> such conduct adequately and in a manner sufficient as to serve as a
> deterrence.
>      . . . .
> The actions of the City of Easton Police Department in stopping,
> arresting, using excessive force against, implementing unlawful
> and improper investigative and surveillance tactics, making false
> statements and criminal complaints against and/or intimidating and
> harassing persons where no legal cause existed to justify the action
> taken, have been brought to the person and/or collection of persons
> within  the County delegated to identifying, responding to,
> investigating and/or disciplining the person and/or persons which
> tolerated, ratified, oversaw, encouraged and/or turned a blind eye
> to, thereby implementing the patterns of misconduct alleged at a
> rate so immense that the person and/or collection of persons
> delegated to correcting such patterns of misconduct must have
> been fully aware of them and willfully declined to address, respond
> to, discipline and/or investigate the person and/or collection of
> persons from which said patterns had arisen adequately and in a
> manner sufficient as to serve as a deterrent.

Sec. Am. Compl. ¶¶ 218−19.

Plaintiff's municipal liability allegations simply paraphrase the pleading standards for municipal liability.  He has not presented any facts regarding an official policy or custom on the part of the Township that caused civil rights violations to be made against him.  Elias v. Twp. of Cheltenham, No. 14-6117, 2015 WL 356966, at *4 (E.D. Pa. Jan. 27, 2015); see also McTernan v. City of York, 564 F.3d 636, 658 (3d Cir. 2009) (holding that a complaint that fails to specify a precise custom or policy fails to satisfy the "rigorous standards of culpability and causation" for a Monell claim.").  Moreover, the second amended complaint does not identify a municipal policymaker or decisionmaker who had knowledge of this purported constitutionally violative policy or custom.  McTernan, 564 F.3d at 658–69; see also Santiago v. Warminster Twp., 629 F.3d 121, 135 n.11 (3d Cir. 2010) (remarking that plaintiff has an "obligation to plead in some fashion that [a person] had final policymaking authority, as that is a key element of a Monell claim.")  Lastly, the second amended complaint does not allege facts showing that Northampton County's failure to investigate, supervise or discipline its police officers has resulted in a pattern of similar constitutional violations such that Northampton County's failure to address the deficiency amounts to deliberate indifference.  See Connick v. Thompson, 563 U.S. 61, 62 (2011) ("A pattern of similar constitutional violations by untrained employees' is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train.") (citation omitted).  Indeed, aside from the incidences involving plaintiff, the second amended complaint pleads no other facts necessary to establish municipal liability.  Accordingly, this claim will be dismissed.

> **c.   Practices by The Northampton County Prison Medical Department in Denying Inmates Adequate Care and Substituting Medications and Treatment Orders Prescribed by More Qualified Doctors (Sec. Am. Compl. ¶¶ 235, 240)**

The next aspect of plaintiff's <u>Monell</u> claim against Northampton County asserts that the Northampton County Prison's medical department employs an "unofficial policy, practice and custom" of both denying inmates with no medical care insurance adequate treatment and substituting medications and/or treatments orders prescribed by doctors.  He avers that these policies are in place for the benefit of the County and the medical provider.  Sec. Am. Compl. ¶¶ 235, 240.

Again this claim stands on tenuous grounds.  Plaintiff generally alleges that between June 2, 2012 and March 26, 2014, he filed numerous sick call request slip forms with the prison's medical unit.  <u>Id.</u> ¶ 80.   On multiple occasions, however, the medical personnel refused to acknowledge his conditions. [7]  Moreover, he asserts that, on July 31, 2012, he was assaulted and suffered a fractured fifth metacarpal bone in his left hand and a laceration on his forearm.  <u>Id.</u> ¶ 90.  He claims that the medical personnel delayed for hours before transporting him to Easton Area Hospital.  <u>Id.</u> ¶¶ 90-91.  Although the Northampton County Prison medical staff was given instructions to provide specified medications and treatment, he contends the prison staff failed to follow these directions and substituted other, non-effective medication for the originally ordered medication.  <u>Id.</u> ¶¶ 91-92.  Further, he alleges the prison staff did not react to his various

---

[7]    Plaintiff argues that between June 2, 2012 and June 12, 2012, he suddenly lost twenty-seven pounds, and between March 6, 2013 and the weeks thereafter, he lost thirty-two pounds. Sec. Am. Compl. ¶¶ 87–88.  He blamed this weight loss on an "accepted unofficial policy, accepted practice and the custom of the Northampton County Prison's food service staff to provide a meal plan to inmates with inadequate caloric content and nutritional value by providing inadequate portions and/or amounts of food with little to no nutritional value."  <u>Id.</u> ¶ 89.  In the subsequent portions of his second amended complaint, however, plaintiff does not bring a <u>Monell</u> claim in connection with this alleged policy.

neurological symptoms resulting from his head injury and failed to perform or arrange for a

neurological exam to diagnose a suspected concussion.  Id. ¶ 93.  Nor, he claims, did the prison

medical staff schedule the prescribed follow-up treatment for his hand with the orthopedic

surgeon.  Id. ¶¶ 94–95.

Following these highly-individualized allegations, plaintiff again makes the following

speculative inference:

> The actions of the Northampton County Prison's Medical
> Departments in failing to provide medical care to certain groups of
> inmates and in being deliberately indifferent to the serious medical
> needs by failing to honor the instruction, and/or to substitute
> medications ordered by physicians, as well as failing to honor the
> dietary needs of some inmates and the generally deliberately
> indifferent actions and inactions of the medical staff with-in the
> prison, especially towards those with no health care, have been
> brought to the attention of the person and/or collection of persons
> with-in the county delegated to identifying, responding to and/or
> investigating, and thereafter disciplining, the persons and/or
> collection of persons who tolerated, ratified, oversaw, encouraged
> and/or turned a blind eye to, thereby implementing, the patterns of
> deliberate indifference to serious medical needs at a rate so
> immense that the person and/or collection of persons dedicated to
> correcting such patterns of misconduct must have been fully aware
> of them and willfully declined to address, respond to, discipline
> and/or investigate the person and/or collection of persons from
> which said patterns of conduct had arisen.

Sec.  Am. Compl. ¶ 221.

Although plaintiff's well-pleaded factual allegations regarding his injuries are entitled to

the presumption of truth, Northampton County cannot simply be held liable for the acts of the

prison employees under a respondeat superior theory or vicarious liability.  Plaintiff fails to

sufficiently plead any facts from which the Court could discern the existence or content of any

policy or custom relating to those injuries.[8]

Nor do plaintiff's suggestions that Northampton County denied him treatment in order to

"benefit the interests" of the County and the medical provider state a proper claim.  Addressing a

similar allegation by a plaintiff that he was harmed by "policies to save money," the Court of

Appeals found such assertions were "exceedingly conclusory."  It noted:

> [T]he complaint does not provide any indication either of (1) what
> the relevant policies are, (2) what basis [the plaintiff] has for
> thinking that "policies to save money" affected his medical
> treatment, or (3) what specific treatment he was denied as a result
> of these policies. More fundamentally, the naked assertion that
> Defendants considered cost in treating [the plaintiff] does not
> suffice to state a claim for deliberate indifference, as prisoners do
> not have a constitutional right to limitless medical care, free of the
> cost constraints under which law-abiding citizens receive
> treatment. . . . Thus, because the complaint pleaded only that [the
> plaintiff] was subjectively dissatisfied with his medical treatment
> and alleged in the most conclusory terms that Defendants

---

[8]        Notably, under Third Circuit jurisprudence, the absence of a policy may provide
the basis for a Monell claim if sufficiently pleaded.  In Natale v. Camden County Correctional
Facility, the Court of Appeals determined that a prison with "no policy ensuring that an inmate
having need for medication for a serious medical condition would be given that medication
during the first 72 hours of incarceration" was a "particularly glaring omission" in a program of
medical care.  Id.  The court concluded that a jury could determine the absence of such a policy
was "sufficiently obvious to constitute deliberate indifference to those inmates' medical needs,"
and thus the plaintiff's Monell claim should have survived summary judgment. Id.
        By contrast, plaintiff's second amended complaint, on its face, does not allege the
absence of a policy to address an inmate's emergency medical situation. Rather, plaintiff
continually cites Northampton County's "policy, practice and custom[s]" of (a) "denying inmates
with no medical care insurance adequate and any, as well as providing deliberately indifferent
treatment, in order to benefit the interests of [the] County and the medical provider" and (b)
"substituting medications and/or treatment orders prescribed by doctors more qualified than
themselves in order to benefit the interests of the County and the medical provider."  Sec. Am.
Compl. ¶¶ 235, 240.  As it is the alleged existence of an affirmative policy or custom and not the
absence of a policy that forms the basis of plaintiff's Monell claim, Natale is inapplicable.  See
Buoniconti v. City of Phila., 148 F. Supp. 3d 425, 439 (E.D. Pa. 2015) (distinguishing Natale
under similar circumstances).

considered cost in providing his care, the District Court properly
dismissed his claims . . .

Winslow v. Prison Health Servs., 406 F. App'x 671, 674–75 (3d Cir. 2011).

Similar to the complaint in Winslow, plaintiff has not pointed to any factual allegations to
support an inference that Northampton County Prison medical staff's alleged conduct was part of
a generally applicable policy or custom designed to effectuate cost savings.  In fact, the second
amended complaint contains no allegations to indicate that these incidents were anything more
than isolated acts by the individual prison medical staff.  In short, although plaintiff's allegations
could plausibly state an Eighth Amendment claim against the individual prison staff, his
allegations do not support an inference either that Northampton County is responsible for the
unconstitutional acts of its employees or that Northampton County's  deliberate conduct was the
moving force behind his injury.  Therefore, this portion of plaintiff's claim against Northampton
County will be dismissed.

### d. Northampton County Prison Staff Policy and Practice of Retaliating against Inmates Who File Grievances Against Guards and Using Excessive Force Where No Such Force Is Necessary (Sec. Am. Compl. ¶¶ 232-233)

The final basis for plaintiff's Monell claim against Northampton Count asserts that the
Northampton County Prison staff employs an "unofficial policy, practice and custom of using
force against inmates where no legal cause exists" and "placing inmates into suicide watch where
no cause exists" as retaliation against inmates.  Sec. Am. Compl. ¶¶ 233–34.  Plaintiff's second
amended complaint describes several instances with corrections officers.  First, upon his original
commitment to Northampton County Prison, plaintiff was confined naked in a suicide cell with
no blankets, pillows, clothing or hygiene products after he made repeated rude comments to the
guard.  Id. ¶¶ 99–109.  Second, on January 7, 2012, plaintiff was handcuffed, held to the ground

and had his head banged on the concrete floor, all without justification. <u>Id.</u> ¶¶ 113–17.  Third,

plaintiff asserts that, on July 31, 2015, he was attacked by another inmate in exchange for drugs,

street food and a job provided by a corrections officer who wanted to retaliate against plaintiff

for filing a grievance. <u>Id.</u> ¶¶ 130–35.  Finally, in March 2014, plaintiff was purportedly

subjected to a forced strip search and a sexual assault after he had given a dirty urine sample and

refused to submit to the search. <u>Id.</u> ¶¶ 191–216.  Attributing these actions to a policy or practice

of Northampton County, plaintiff then alleges:

> The actions of the Northampton County Prison staff members in
> retaliating against and intimidating inmates who have reported
> officer misconduct, using excessive and unreasonable force against
> inmates where no legal cause existed which would justify a use of
> force and/or using force as retaliation for some action of an inmate
> which did not justify a use of force, and/or using force against,
> harassing, intimidating and/or otherwise retaliating against inmates
> who have brought legal action against an officer, the county or
> some other county official, have been brought to the attention of
> the person and/or collection of persons with-in the county
> delegated to identifying, responding to, investigating, and/or
> disciplining the person and/or persons which tolerated, ratified,
> oversaw, encouraged and/or turned a blind eye to, thereby
> implementing, the patterns of misconduct alleged, at a rate so
> immense that the person and/or collection of persons delegated to
> correcting such patterns of misconduct must have been fully aware
> of them and willfully declined to address, respond to, discipline
> and/or investigate the person and/or collection of persons from
> which said patterns had arisen adequately and in a manner
> sufficient as to serve as a deterrent.

<u>Id.</u> ¶ 220.

Plaintiff's second amended complaint, although alleging an affirmative policy or practice,

appears to actually claim that the <u>Monell</u> violation arises from a failure to train or discipline with

respect to the excessive use of force.  A custom of failing to investigate complaints may provide

a basis for municipal liability if the "a policy-maker (1) had notice that a constitutional violation

was likely to occur, and (2) acted with deliberate indifference to the risk." <u>Hernandez v.</u>

Borough of Palisades Park Police Dep't, 58 F. App'x. 909, 912 (3d Cir. 2003); Beck v. City of

Pittsburgh, 89 F.3d 966, 973 (3rd Cir. 1996); Maiale v. Youse, No. 03–5450, 2004 WL 1925004,

at *8 (E.D. Pa. Aug. 27, 2004).  Plaintiff must also show that the failure to investigate

proximately caused his injuries.  Maile, 2004 WL 1925004, at *8.

The second amended complaint lacks allegations suggesting any of the actors involved in

the alleged attacks on plaintiff had previously engaged in similar acts against other inmates.  Nor

does plaintiff allege that any such similar attacks had been brought to the attention of a

supervising officer.  Finally, plaintiff makes no effort to identify any potential deficiencies in the

training, supervision or discipline of the corrections officers.  Absent something more than a

mere recitation of the elements of a Monell claim, plaintiff's cause of action against

Northampton County cannot survive Rule 12(b)(6) scrutiny.

### 2.    State Law Claims Against Northampton County

Finally, plaintiff brings multiple state law claims against Northampton County, including

assault, battery, false arrest, false imprisonment, malicious prosecution, sexual assault and

neglect of a dependent person.  Defendants declare immunity against all of these claims.

Under the Pennsylvania Political Subdivision Tort Claims Act (Tort Claims Act), "no

local agency shall be liable for any damages on account of any injury to a person or property

caused by any act of the local agency or an employee thereof or any other person."[9]  42 Pa.

Cons. Stat. § 8541.   A local agency includes any government unit other than the Commonwealth

government, including County governments.  42 Pa. Cons. Stat. § 8501.  "The clear intent of the

Tort Claims Act was to insulate the government from exposure to tort liability," so "[t]ort

---

[9]    Defendants also allege that the actors responsible for the events giving rise to Plaintiff's
state law claims were not employees of Northampton County.  As I dismiss these claims on other
grounds, I need not reach this argument.

immunity is a non-waivable, absolute defense." McShea v. Phila., 606 Pa. 88, 995 A.2d 334, 341

(Pa. 2010).  This sweeping immunity bars "any suit involving an injury, whether the injury is

physical, mental, reputational or economic, . . . unless the suit falls within one of the eight

exceptions . . . contained in section 8542(b)." E–Z Parks, Inc. v. Phila. Parking Auth., 532 A.2d

1272, 1277 (Pa. Commw. Ct. 1987).  These eight exceptions, which delineate the limited waiver

of immunity, include: (1) operation of motor vehicles; (2) care, custody or control of personal

property; (3) care, custody or control of real property; (4) dangerous conditions of trees, traffic

controls and street lighting; (5) dangerous conditions of utility service facilities; (6) dangerous

conditions of streets; (7) dangerous conditions of sidewalks and (8) care, custody or control of

animals.  42 Pa. Cons. Stat. § 8542(b)(1)–(8).

In addition, for the waiver of immunity to apply, the injury at issue must have been

"caused by the negligent acts of the local agency or an employee thereof acting within the scope

of his office or duties."  42 Pa. Cons. Stat. § 8542(a)(2).  Since "negligent acts" do "not include

acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct," id.,

the Tort Claims Act shields local government entities from liability for the intentional torts of

their employees. See Thomas v. Cianfrani, No. 01–3096, 2009 WL 1704471, at *4–5 (E.D. Pa.

June 17, 2009) (noting that the exceptions to governmental immunity are limited to claims of

negligence); Heckensweiler v. McLaughlin, 517 F.Supp.2d 707, 719 (E.D. Pa. 2007) (observing

that "Township is categorically immune from any intentional acts.").

In the present case, plaintiff's state law claims all involve actions for intentional torts.[10]

Claims of assault and battery have been held to be precluded by the Tort Claims Act.  Panas v.

---

[10]     In his second amended complaint, plaintiff asserts that "[b]ecause the acts of those
described individuals with-in the complaint were conducted in a malicious, willful, reckless and
callous disregard for my rights under federal and state law, the County of Northampton has

City of Phila., 871 F. Supp. 2d 370, 376 (E.D. Pa. 2012).  Likewise, false arrest and false

imprisonment claims have been deemed intentional torts that are precluded by the Tort Claims

Act.  Waldon v. Borough of Upper Darby, 77 F. Supp. 2d 655, 659 (E.D. Pa. 1999).  Finally,

claims arising in the context of confinement—such as plaintiff's excessive force, excessive bail

and denial of medical care claims—are intentional torts for which the County is immune from

liability.  Bowers v. City of Phila., No. 06-3229, 2008 WL 5210256, at *7 (E.D. Pa. Dec. 12,

2008).  Even if any of these claims could be considered unintentional torts, none of them fall

within one of the eight enumerated exceptions to municipal liability in 42 Pa.C.S. § 8542(b).  As

plaintiff has sued only Northampton County and not any of the individual actors, I must dismiss

these claims.

## CONCLUSION

In light of the foregoing, I will grant both Kane's motion to dismiss and Buskirk's and

Northampton County's motion to dismiss.  An appropriate order follows.

---

consented to be sued as a result of them.  42 Pa.C.S. §§ 8542, 8550." (Sec. Am. Compl. ¶ 253.)
Plaintiff's reference to 42 Pa.C.S. § 8550, relating to willful misconduct, as subsuming 42
Pa.C.S. § 8541's general retention of municipal immunity is misplaced.  Section 8550 waives
four specific immunities for willful misconduct, *i.e.,* immunities relating to official liability,
official immunity, indemnification and damage limitations.  See 42 Pa. Cons. Stat. §§ 8545,
8546, 8548, 8549.  Each of the waived immunities, however, exposes municipal employees to
personal liability without dissolving the shield of general immunity retained by municipalities.
In other words, "42 Pa.C.S.A. § 8550 jettisons only those immunities held by municipal
*employees* and only then for forms of willful misconduct.  This section does not, however,
abrogate the general retention of *municipal* immunity."  Buskirk v. Seiple, 560 F. Supp. 247, 252
(E.D. Pa. 1983) (emphasis in original).